Eastern District of Kentucky
FILED
JUL 2 - 2007
AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at FRANKFORT

CRIMINAL ACTION NO. 07-08-KKC

UNITED STATES OF AMERICA,  PLAINTIFF

V.  **PROPOSED FINDINGS OF FACT AND RECOMMENDATION**

STEPHEN GREGORY MALCOLM,  DEFENDANT

\* \* \* \* \* \* \* \* \* \*

## I. INTRODUCTION

On April 26, 2007, a federal grand jury returned a two-count indictment against defendant Stephen Gregory Malcolm. Count 1 thereof charged that on or about March 4, 2007, defendant maliciously damaged and destroyed and attempted to damage and destroy by means of fire, buildings and businesses and other real and personal property used in interstate commerce and in activities affecting interstate commerce, that is, the buildings located at 325, 327, 329, 331, 333, and 335 St. Claire Street, Frankfort, Kentucky, said buildings housing the businesses known as The Brick Alley, Tink's Bar-B-Que and Deli, the Downtowner Bar, and Serafini Restaurant, and seven rental-property residence apartments located above the businesses, all in violation of 18 U.S.C. § 844(I); Count 2 thereof charged that on or about March 9, 2007, defendant did knowingly and willfully make a materially false statement to ATF Special Agent Gary Smith, relative to defendant's whereabouts in the early morning hours of Sunday, March 4, 2007, all in violation of 18 U.S.C. § 1001(a)(2).

Defendant pled not guilty to the foregoing charges, and this matter is presently scheduled for a pretrial conference on August 1, 2007, at which time a trial date will be assigned.

On June 4, 2007, defendant moved to suppress certain statements made to ATF Agent Robert Young and Frankfort Police Detective Alan Burton while being interviewed by them at the ATF office in Lexington, Kentucky, on April 4, 2007. [DE #21]. Specifically, defendant seeks to suppress his statements concerning the March 4 fire in the St. Claire Street Building in Frankort, Kentucky,

and his statements concerning his admission that he had not given truthful answers to ATF Agent Gary Smith during his initial interview by investigators a few days following the fire on March 4.

On June 7, 2007, the United States filed its response in opposition to said motion to suppress, arguing that no violation of *Miranda* or *Edwards* occurred. [DE #22].

Consistent with standing Order, this matter was referred to the undersigned Magistrate Judge, pursuant to 28 U.S.C. § 636(b), for hearing on defendant's motion to suppress.

A suppression hearing was held on June 8, 2007. The United States was represented by Assistant United States Attorney James Arehart. Defendant was present in person and was represented by David J. Guarnieri. This suppression hearing was transcribed by June St. John, contract court reporter.

At the suppression hearing, the Magistrate Judge heard testimony from ATF Special Agent Robert Young, who was the lead interviewer during the interview with defendant on April 4, 2007. Special Agent Young was questioned by counsel for the United States and by defendant's counsel.

Subsequent to the suppression hearing, the parties filed post-hearing memoranda in further support of and in opposition to defendant's motion to suppress [DE ##28, 29, and 31]. This matter stands submitted for a report and recommendation to the district court on defendant's motion to suppress.

## II. FACTUAL BACKGROUND

A few days following the fire that is the subject of this indictment, defendant was interviewed by ATF Special Agent Gary Smith concerning defendant's whereabouts in the early morning hours of Sunday, March 4, 2007, when the fire occurred. At some time thereafter, the investigation of this fire was assigned to ATF Special Agent Robert Young. Subsequently, on April 3, 2007, Agent Young contacted defendant to inquire whether he would agree to be available for a second interview. In making this request, Agent Young represented to defendant that the purpose of this second interview was two-fold: (1) Agent Young had recently been assigned to this case and needed this

interview to "get up to speed" in this case, and (2) to verify certain alibi facts that defendant had provided to ATF Agent Gary Smith during the initial interview on March 4, 2007.

Defendant consented to be available for a second interview, and this interview was scheduled for April 4, 2007, at the ATF Office in Lexington, Kentucky. Some time prior to the scheduled interview, defendant text-messaged Agent Young and advised Agent Young that he was having trouble getting away from work[1] to come to the ATF Office for this interview. Upon receipt of this text message, Agent Young telephoned defendant, and defendant asked if the interview could be conducted at his place of employment, Green's Toyota, instead of at the ATF Office. In response, Agent Young explained to defendant that doing the interview at Green's Toyota was problematic because (1) there would likely be too many distractions and interruptions occurring during the interview, given defendant's line of work as a car salesman, to conduct a meaningful interview there, and (2) defendant's employer would probably not want ATF agents on the premises at Green's Toyota, perceiving their presence as an interruption to its business activities. Therefore, later that day, defendant drove to the ATF Office in Lexington, Kentucky, for this second interview.

The interview, which was videotaped, occurred in a windowless room, with defendant and SA Young and Frankfort Police Detective Alan Burton seated at a table that was pushed up against a wall, with room for three people to sit at the table. Defendant sat facing the wall, SA Young was seated on defendant's right, and Detective Burton was seated on defendant's left. There were two doorways providing ingress and egress to the interview room. At the beginning of the interview, SA Young advised defendant that he was not under arrest, that he could terminate the interview at any time, and SA Young pointed out to defendant that the two doors to the interview room were unlocked so that defendant could exit the interview room at any time. Defendant was not restrained in any way.

---

[1] At that time, defendant was employed as a salesman for Green's Toyota in Lexington, Kentucky.

3

During the approximate first hour of this interview, before defendant made incriminating statements, either SA Young or Detective Burton advised defendant on five separate occasions that he was not under arrest and that he was free to terminate the interview and leave. After defendant made incriminating statements, he was *Mirandized*, but did not terminate the interview and continued making statements to SA Young and Detective Burton.

### III. MOTION TO SUPPRESS

As grounds for his motion to suppress, defendant first contends that the April 4 interview was a custodial interrogation; therefore, it was unlawful for the agents to interview him without first advising him of his constitutional rights, including the right against self-incrimination and the right to counsel. Second, defendant asserts that during the interview, he communicated his desire to speak to an attorney before answering additional questions and that the agents failed to honor this request and unlawfully proceeded with the interview. Third, defendant also argues that even though he was subsequently *Mirandized* during the interview, based on the fact that he had previously communicated a desire to speak with an attorney, the agents unlawfully continued to question him after reading him his *Miranda* rights, as he had never waived his right to an attorney.

In response, the United States objects to defendant's motion to suppress, asserting that this interview was not a custodial interrogation, that defendant did not unambiguously request to speak to an attorney, and that defendant waived his right to counsel, as evidenced by the fact that defendant did not terminate the interview and leave, as he was free to do, and elected to proceed with the interview.

**A.    Custodial interrogation**

At the outset, it must be determined whether the interview in question constituted a custodial interrogation. If so, defendant's motion to suppress may have merit.

### Applicable Law

It is clear from *Miranda v. Arizona*, 384 U.S. 436 (1966), that warnings are required when a defendant is the subject of custodial interrogation. According to the *Miranda* Court, custodial

4

interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. In determining whether a defendant was subject to custodial interrogation, the court looks to the totality of the circumstances "to determine how a reasonable man in the suspect's position would have understood the situation." *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003); *United States v. Crossley*, 224 847, 861 (6th Cir. 2000); *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998).

The Supreme Court applied the *Miranda* custody test for the first time in *Oregon v. Mathiason*, 429 U.S. 492 (1977), wherein Mathiason was a suspect in the theft from a residence near Pendleton, Oregon. Police had tried several times to contact Mathiason with no success, and after about 25 days, an officer left his card at Mathiason's apartment along with a note asking Mathiason to call him. *Id.* at 493. Subsequently, Mathiason telephoned the officer the next afternoon, and the officer asked where it would be convenient for them to meet. *Id.* Mathiason indicated no preference, so the officer asked Mathiason to meet him at the police station. *Id.* Mathiason complied and voluntarily met the officer at the station, where he was taken into a room and was told that he was not under arrest. The officer then informed Mathiason that he believed Mathiason was involved in the burglary and falsely stated that Mathiason's fingerprints were found at the scene. *Id.* After a few moments, Mathiason confessed to having taken the property. *Id.* The officer then advised Mathiason of his *Miranda* rights. *Id.*

The Supreme Court held that "it is clear from these facts that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way,'" at the time he confessed, and therefore *Miranda* warnings were not required. *Id.* at 495 (internal citation omitted). The *Mathiason* Court further opined that "such a non-custodial situation is not converted into one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a coercive environment." *Id.* "Any interview of one suspected of a crime by a police officer will have coercive

aspects to it ... but police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed ... because the questioned person is one whom the police suspect." *Id.*

"The ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of a degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1123 (1983). There has to be a "significant deprivation" of freedom of action in order to amount to custody. *Id.*; *Mason v. Mitchell*, 320 F.3d 604, 632 (6th Cir. 2003). A non-custodial interview is not transformed into a custodial one simply because "the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Mathiason* at 495; *Mason v. Mitchell*, 320 F.3d at 631. A "coercive environment" is not enough to transfer a non-custodial interview into a custodial one. *Id.*

### Discussion/Analysis

Based on the factual background surrounding SA Young's request to conduct a second interview with the defendant, and based on a review of the videotape of the interview in question, the Magistrate Judge concludes that the approximate first hour of the interview, up to the point where defendant makes incriminating statements and is *Mirandized*, is a non-custodial interrogation. The rationale underlying this conclusion is set out in detail below.

At the outset, it is important to keep in mind that defendant was asked if he would be willing to be interviewed a second time; he was not told that he had to talk to the officers. Thus, defendant was not compelled to be interviewed; he voluntarily agreed to the interview. The time of the interview was set to accommodate defendant's work schedule, and defendant voluntarily drove himself to the ATF office for this interview. The backdrop leading to the interview was non-coercive, and the nature of this interview remained non-coercive, as evidenced by the fact that once defendant was in the interview room, SA Young advised him that he was not under arrest and showed him that the door to the room was unlocked. Additionally, defendant was not handcuffed or restrained in any way.

Thereafter, a few minutes into the interview, SA Young again advised defendant that he was not under arrest[2] and that he was free to terminate the interview and leave. SA Young was unarmed. During the interview, defendant was given a soft drink and later, there was a break in the interview for the purpose of allowing defendant to use the bathroom.[3] When defendant took a bathroom break, he reached for the handle on the door in the interview room, indicating that he knew the door was unlocked. Thus, the atmosphere surrounding this interview remained non-coercive throughout the interview to the point where Malcolm makes incriminating statements and is ultimately arrested.

The fact that the interview occurred at the ATF office and that Malcolm was the prime suspect, even if viewed as creating a coercive environment, did not amount to custodial interrogation. *Mathiason*, 429 U.S. at 495; *Mason v. Mitchell*, 320 F.3d at 631-32. The length of the interview is not an issue. *Id.* (In *Mason v. Mitchell, supra,* an interview lasting more than four hours was found to be non-custodial). There was no "significant deprivation" of defendant's freedom that amounted to custody. *Beheler* at 123, *Mason v. Mitchell* at 632. Additionally, the fact that SA Young may have deceived defendant about some facts and the reasons for conducting another interview is not relevant to the issue of custody. *Mathiason* at 495-96.

During the whole hour of the interview prior to his making incriminating statements, the videotape shows a very relaxed Malcolm who gave no indication that he thought he was under arrest or that he wanted to leave. A key fact that shows Malcolm knew he was not under arrest until he made incriminating statements is that once he accepted responsibility for setting the fire he asked, "Am I under arrest, now?" Obviously, he would not have asked the question ending with "now" if he had thought he was already under arrest.

---

[2] In fact, during that portion of the interview preceding defendant's incriminating statements, defendant was advised on five separate occasions, either by SA Young or Detective Burton, that he was not under arrest and that he was free to leave.

[3] The officers did not honor defendant's request to be allowed to smoke because the building in which the ATF office is located is a non-smoking building.

7

Consequently, based on the conclusion that defendant was not being subjected to a "custodial interrogation" prior to point in the interview when he made incriminating statements, the Magistrate Judge also concludes that Malcolm was not entitled to counsel at that time and that the officers were not required to *Mirandize* Malcolm at that time. Therefore, no constitutional violation occurred during that portion of the interview before Malcolm made incriminating statements.

**B.     Defendant's statement concerning counsel**

At about forty (40) minutes into the interview, the following colloquy occurred between Malcolm and SA Young:

> MALCOLM: I think before I say anything, I probably should have an attorney. I mean realistically –
>
> SA YOUNG: That's your call.
>
> MALCOLM: I mean – I don't know.
>
> SA YOUNG: I can't give you legal advice on that, Greg. I'm not in the business of giving legal advice. But what I'm telling you is, if that's the route you want to go, then I would get your attorney to get up with me as soon as possible. I know you haven't asked for one yet. But, if that's the route you want to go. This is going to the federal prosecutor. I'm going to talk to him today, so . . .

Videotape, 4/4/07 [Joint Exhibit 1 to Suppression Hearing].

Defendant contends in his motion to suppress that the foregoing statement concerning counsel was a request for counsel and that once that request was made, the officers were required to stop interrogating him until he had the opportunity to consult with counsel and that since the officers did not cease their interrogation of him after he made this request for counsel, all statements made subsequent to his request for counsel must be suppressed, as they were obtained from him in violation of his constitutional rights.

In response to this argument, the United States asserts that even assuming *arguendo* that Malcolm was being subjected to a custodial interrogation at the time he made the foregoing statement concerning counsel, this statement was ambiguous and was not sufficiently clear to convey to SA Young and Detective Burton that he was requesting an attorney. For this reason, the United

States contends that the agents were not obligated to cease the interview until Malcolm had an opportunity to consult with counsel.

## Discussion/Analysis

In *Burket v. Angelone*, 208 F.3d 172 (4th Cir. 2000), the court considered a situation surrounding the defendant's confession that is similar to the present action. In *Burket*, the defendant consented to being interviewed at the police station, and he voluntarily rode in a police car to the police station with two detectives. The *Burket* court described the scenario that occurred after Burket arrived at the police station, as follows:

> The detectives and Burket arrived at the police headquarters at 2:30 p.m., and they went to an interview room. Hoffman closed the door to the interview room and informed Burket that he had done so to ensure their privacy. The detectives did not want the noise in the adjacent offices to interfere with the interview. Burket was not restrained or handcuffed in any way. The closed door was not locked. Hoffman advised Burket again that he was not under arrest and that he was free to leave at any time.
>
> The interview commenced at 2:40 p.m. A video-audio tape was made of the interview. At 3:20 p.m., the detectives falsely informed Burket that the children inside the Tafelski home had seen him in the house on the night of the murders. Burket denied that he was in the house at any time on that night. At 3:22 p.m., the officers created another ruse by telling Burket that hair samples similar to his hair were found in the victims' residence. Then, Burket admitted that he had been in the victims' residence on the day of the murders. At 3:24 p.m., Burket stated, "I'm gonna need a lawyer." The detectives immediately advised Burket that he was not under arrest and that he was free to leave at any time if he so desired. Burket continued to talk with the detectives, stating that on the night of the murders, he had entered the residence when he noticed the rear door had been broken. He stated that he walked in, observed the victims, and immediately left the house. Later, Burket said that he had lost control of his emotions and had accidentally killed the victims.

*Id.* at 195.

In considering Burket's claim raised in his petition filed pursuant to 28 U.S.C. § 2254 wherein he claimed that his confession should have been suppressed because the police violated *Miranda* and some of its progeny, the Fourth Circuit analyzed this claim, as follows:

1

> Burket claims that his confession was inadmissible under *Miranda* because he was "in custody" when he stated "I'm gonna need a lawyer" and the police failed to advise him of his *Miranda* rights. On direct appeal, the Virginia Supreme Court rejected this claim, holding that Burket was not "in custody" under *Miranda* and its progeny,

9

and, therefore, no *Miranda* warnings were required after Burket stated "I'm gonna need a lawyer." *See Burket v. Commonwealth,* 450 S.E.2d at 129-30.

In order to protect the right granted by the Fifth Amendment that "[n]o person ... shall be compelled in any criminal case to be a witness against himself," U.S. Const. Amend. V, the Supreme Court in *Miranda* adopted prophylactic procedural rules that must be followed during custodial interrogations. *See* 384 U.S. at 444, 86 S.Ct. 1602. The Court held that a suspect in custody "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* In general, any statements elicited from a suspect in violation of these rules are inadmissible in the prosecution's case-in-chief. *See Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) *(per curiam).* The procedural safeguards prescribed by *Miranda* only apply "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) *(per curiam).* A person is "in custody" for purposes of *Miranda* if the person has been arrested or if his freedom of action has been curtailed to a degree associated with arrest. *See Stansbury,* 511 U.S. at 322, 114 S.Ct. 1526. The proper perspective for determining whether a suspect is "in custody" at the time of questioning is whether "a reasonable [person] in the suspect's position would have understood his situation ... as the functional equivalent of formal arrest." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

Applying these principles, it is clear that Burket was not "in custody" at the time he said "I'm gonna need a lawyer." Burket voluntarily went to the police station upon request. Prior to the interview, Burket was advised that he was not under arrest and free to leave at any time. And after Burket said, "I'm gonna need a lawyer," Detective Hoffman again informed Burket that he was not under arrest and free to leave. In light of these facts, Burket was not entitled to *Miranda* warnings after he stated "I'm gonna need a lawyer." *See California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (holding that defendant was not "in custody" for purposes of *Miranda* even though the police questioned him in the station house and considered him the main suspect); *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711 (holding that defendant was not entitled to *Miranda* warnings because he went to the police station voluntarily, was informed that he was not under arrest, and left the station after police questioning). Accordingly, the Virginia Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

2

Burket also contends that his *Miranda* rights were violated when he invoked his right to counsel by stating "I think I need a lawyer" and the police failed to cease the interrogation at that point. On direct appeal, the Virginia Supreme Court rejected this claim, holding that Burket's *Miranda* rights were not violated because no *Miranda* warnings were required until the police officers searched him and placed him under arrest, and Burket's statement "I think I need a lawyer" occurred before he was searched and placed under arrest. *See Burket v. Commonwealth,* 450 S.E.2d at 131.

    For two independent reasons, Burket's claim fails. First, Burket's claim fails because he was not "in custody" at the time he stated "I think I need a lawyer." As noted above, a person is "in custody" for purposes of *Miranda* if the person has been arrested or if his freedom of action has been curtailed to a degree associated with arrest. *See Stansbury*, 511 U.S. at 322, 114 S.Ct. 1526. At the time Burket stated "I think I need a lawyer," he was neither arrested, nor was his freedom of action curtailed to a degree associated with arrest. *See Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517; *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711. Under such circumstances, Burket could not invoke the protections provided by *Miranda*. *See United States v. Wyatt*, 179 F.3d 532, 537 (7th Cir.1999) ("The Fifth Amendment right to counsel safeguarded by *Miranda* cannot be invoked when a suspect is not in custody."); *United States v. Bautista*, 145 F.3d 1140, 1147 (10th Cir.) ("Thus, in order to implicate the *Miranda-Edwards* right to counsel prophylaxis, both a custodial situation and official interrogation are required."), *cert. denied*, 525 U.S. 911, 119 S.Ct. 255, 142 L.Ed.2d 210 (1998).

    Second, Burket's claim fails because, even if he was being subjected to a custodial interrogation at the time he stated "I think I need a lawyer," he did not invoke his right to counsel. Under *Miranda*, a suspect in custody who invokes his right to counsel cannot be subjected to further police interrogation until counsel is present or the suspect initiates further conversation. *See Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). However, to invoke the right to counsel and prevent further interrogation, a suspect must unambiguously request the assistance of counsel. *See Davis v. United States*, 512 U.S. 452, 458-60, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). In *Davis*, the defendant's statement "Maybe I should talk to a lawyer" did not invoke the right to counsel because the statement was not clear enough to alert a reasonable police officer that he was requesting an attorney. *Id.* at 458-62, 114 S.Ct. 2350.

    In this case, Burket said to the officers "I think I need a lawyer." This statement does not constitute an unequivocal request for counsel. In fact, Burket's statement is quite similar to the defendant's statement in *Davis* ("Maybe I should talk to a lawyer"), which the Supreme Court found ambiguous. *Id.; see also Mueller*, 181 F.3d at 573-74 (petitioner's question to officer, "Do you think I need an attorney here," did not constitute unambiguous request for counsel).

    In summary, the Virginia Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

*Burket*, 208 F.3d at 196-98.

    Due to the factual similarities between the present action and *Burket*, the Magistrate Judge concludes that the foregoing analysis and rationale employed by the court in *Burket* is equally applicable to the present case. Just as in *Burket*, Malcolm's claim that his constitutional rights were violated because the officers continued their interrogation of him after he had made a request for counsel is without merit for two independent reasons. First, Malcolm, like Burket, was not "in

custody" at the time he made the statement, "I think before I say anything, I probably should have an attorney. I mean realistically –". At the time Malcolm made this statement, he had not been arrested, his freedom of action had not been curtailed to a degree associated with arrest, and the agents advised Malcolm, both prior to and subsequent to this statement that he was not under arrest and was free to leave. Therefore, *Burket* teaches that under these circumstances, Malcolm could not invoke the protections provided by *Miranda*, as he was not "in custody" at that time.

However, assuming *arguendo* that Malcolm was "in custody" at the time he made the statement, "I think before I say anything, I probably should have an attorney. I mean realistically –", the Magistrate Judge concludes that this claim is nevertheless without merit because this statement is not an *unambiguous* request for counsel. This conclusion is based not only on the foregoing statement itself, but also based on a consideration of the context of Malcolm's conduct, actions, and related statements made near in time to the statement. When Malcolm's statement concerning counsel is viewed not in isolation but in context, it is clear that this statement was not an unambiguous request for counsel. This conclusion is based on the following facts:

1. Following SA Young's comment to Malcolm that if wants to talk to an attorney (" if that's the route you want to go"), then he should have his attorney contact SA Young as soon as possible ("then I would get your attorney to get up with me as soon as possible."), Malcolm does not say or do anything to indicate to SA Young that he wanted to get an attorney.

2. Following SA Young's comment to Malcolm acknowledging that Malcolm had not yet requested to talk to an attorney (" I know you haven't asked for one yet."), Malcolm makes no effort to correct SA Young to say that he has requested or is then presently requesting an attorney.

3. A few minutes later in the interview following the exchange between Malcolm and SA Young referenced above, Detective Burton asks Malcolm, "Can I ask you a question?," to which Malcolm responded, "Yes," which clearly indicates that Malcolm is consenting to proceeding with the interview without any consultation with or advice of counsel.

Thus, Malcolm's statement that "I think before I say anything, I probably should have an attorney. I mean realistically –" is at best an ambiguous request for counsel. As seen in *Burket*, an ambiguous request for counsel is insufficient to invoke one's *Miranda* rights and to prevent further interrogation. ("However, to invoke the right to counsel and prevent further interrogation, a suspect must unambiguously request the assistance of counsel." *Burket*, 208 F.3d at 198). This statement, similar to the statement considered in *Burket* and similar to the statement at issue in *Davis v. United States*, 512 U.S. 452 (1994) ("Maybe I should talk to a lawyer") was not clear enough to alert a reasonable police officer that Malcolm was requesting an attorney. *Id.* at 458-62.

In support of his claim concerning his request for counsel, Malcolm relies on *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004), wherein Abela was convicted of manslaughter stemming from a stabbing incident at a party. The factual background of the events occurring subsequent to the stabbing incident and surrounding Abela's request for counsel is set out below:

> Abela fled to a friend's house, where he called 911 and told the operator that he had stabbed someone. After meeting the police back at Howard's house, Abela was taken to a hospital emergency room for treatment. While at the emergency room, but before being treated for his injuries, Oakland County Police Sergeant Michael McCabe began interrogating Abela about the events leading up to the stabbing. Abela responded by stating, "maybe I should talk to an attorney by the name of William Evans," and he showed Sergeant McCabe Evans's business card. Sergeant McCabe agreed to call Evans for Abela and left the room, presumably to contact Evans. Upon returning, McCabe made no mention of Evans, and proceeded to read Abela his *Miranda* rights. Abela then signed a form waiving those rights and gave a statement to Sergeant McCabe. After being treated at the hospital, Abela was taken to the police station. He gave another statement there. In both statements, Abela admitted to stabbing Underwood, but claimed that he did so in self defense. The statements were admitted at trial and used by the prosecution against Abela.

*Id.* at 919.

In his habeas petition, Abela claimed that the statements obtained from him should have been suppressed because they were obtained in violation of his Fifth Amendment right to counsel. On appeal, the Sixth Circuit agreed, explaining its rationale, as follows:

> The Fifth Amendment to the U.S. Constitution guarantees that "no person ... shall be compelled in any criminal case to be a witness against himself." Although the Fifth Amendment does not guarantee a right to counsel, in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that in certain pretrial stages-namely, custodial interrogation-the privilege against

13

self-incrimination includes an implied right to counsel. This right is triggered when a suspect is interrogated while "in custody" or "otherwise deprived of his freedom in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602; *California v. Beheler*, 463 U.S. 1121, 1126, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (holding that suspect's voluntary appearance and departure at police station for questioning was not custodial interrogation). The Supreme Court has broadly defined "interrogation" as any police questioning of a suspect in custody "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 n. 7, 302, n. 8, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

In *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court established a brightline rule that once a suspect is in custody and invokes the right to counsel, law enforcement may not further interrogate him until counsel has been made available, or unless the suspect initiates further conversations or exchanges with the police. To trigger the *Edwards* rule, the suspect's invocation of the right to counsel must be clear and unambiguous. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," then cessation of questioning is not required. *Id.*

Here, the parties do not dispute that Abela was being subject to custodial interrogation at the hospital when he expressed a desire to speak to his attorney, William Evans, and then showed Sergeant McCabe Evans's business card. Although, at that point, Abela had not yet been read his *Miranda* warnings, the Fifth Amendment's implied right to counsel was triggered because Abela was being subjected to custodial interrogation by Sergeant McCabe. Accordingly, this case differs from those in which a request for counsel preceding *Miranda* warnings is deemed ineffective. *See, e.g., Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir.), *cert. denied*, 530 U.S. 1283, 120 S.Ct. 2761, 147 L.Ed.2d 1022 (2000) (request for a lawyer when suspect was not in custody and was told that he was free to leave did not render subsequent admissions inadmissible).

But the parties do dispute whether or not Abela's request for counsel was clear and unambiguous such that the *Edwards* protections were triggered and the police were compelled to cease questioning immediately. In *Davis*, the defendant was informed of his right to remain silent and to have an attorney present during questioning, and he waived those rights. *Davis*, 512 U.S. at 454, 114 S.Ct. 2350. However, approximately one-and-a-half hours into the interview, the defendant stated, "Maybe I should talk to a lawyer. *Id.* at 455, 114 S.Ct. 2350. Investigators immediately inquired whether the defendant was "asking for a lawyer," or whether he was "just making a comment about a lawyer," and the defendant responded: "No, I'm not asking for a lawyer ... No, I don't want a lawyer." *Id.* (internal quotation marks omitted). On appeal, the defendant argued that he had invoked his right to counsel and that, therefore, police questioning should have ceased. But the Supreme Court concluded that the defendant's statement-"Maybe I should talk to a lawyer"-was ambiguous, and not sufficiently clear such that a reasonable police officer in the circumstances would have understood the statement to be a request for an attorney. *Id.* at 462, 114 S.Ct. 2350; *see also Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir.1994) (holding that the defendant's statement that "it would be nice" to have an attorney was not a clear and unambiguous request for counsel).

14

Furthermore, the investigators' questions had helped clarify that Davis was not, in fact, requesting an attorney. *Id.* at 461. ("Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel.").

Respondent contends that Abela's case is identical to *Davis,* because, when Sergeant McCabe began questioning Abela, he responded by stating, "maybe I should talk to an attorney by the name of William Evans." Respondent argues that Abela's use of the word "maybe" is dispositive. We disagree, because in this case, unlike in *Davis,* the circumstances surrounding the statement were such that "a reasonable officer would have understood" that Abela was clearly and unequivocally invoking the right to counsel. Abela did not merely say, "Maybe I should talk to an attorney," as did the defendant in *Davis.* Rather, Abela named the specific individual with whom he wanted to speak and then showed Sergeant McCabe the attorney's business card. McCabe said he would call Abela's attorney for him and left the room presumably to do so. Although our inquiry is an objective one, *id.* at 459, 114 S.Ct. 2350, McCabe's actions confirm that a reasonable officer would understand Abela's statement to be a clear request for counsel.

The events surrounding Abela's statement sharply contrast with the facts in *Davis,* where the suspect followed his purported request for counsel with a statement indicating that he was not asking for counsel. In our case, the events surrounding Abela's request corroborate the unequivocal nature of that request. Accordingly, we reject Respondent's contention that the word "maybe" be viewed in isolation, and as dispositive of the question before us. Moreover, as we have determined in other cases, language that might be less than clear, when viewed in isolation, can become clear and unambiguous when the immediately surrounding circumstances render them so. *See Kyger v. Carlton,* 146 F.3d 374, 376 (6th Cir.1998) (finding an unequivocal request for counsel where the defendant stated that "I would just as soon have an attorney," in response to an officer's asking him: "Would you answer some of our questions, without an attorney present?"). We note that a court's use of surrounding circumstances to evaluate the clarity of a suspect's request for counsel neither is precluded by nor alters the Supreme Court's decision declining to adopt a rule requiring officers to ask clarifying questions in these circumstances. *Davis,* 512 U.S. at 461-62, 114 S.Ct. 2350.

After Abela requested counsel, the police were required to cease questioning him until he had a lawyer present. The police's failure to cease questioning Abela-that is, both (1) Sergeant McCabe's returning to Abela, reading him his *Miranda* rights, and proceeding to interrogate him at the hospital, and (2) the police questioning that continued in the morning, at the police station, after Abela was released from the hospital-violated Abela's right to counsel, the contours of which are clearly established by federal law and Supreme Court precedent. *Minnick v. Mississippi,* 498 U.S. 146, 153-54, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). Furthermore, because Abela's statements were self-incriminating and among the most significant evidence marshaled against him by the state, we do not find their admission into evidence harmless.

*Abela,* 380 F.3d at 925-27.

In *Abela*, after the police officer began questioning Abela in the hospital, Abela responded by first stating, "maybe I should talk to an attorney by the name of William Evans," and he showed Sergeant McCabe Evans's business card. Sergeant McCabe agreed to call Evans for Abela and left the room, presumably to contact Evans. Upon returning, McCabe made no mention of Evans, and proceeded to read Abela his *Miranda* rights. Based on the circumstances presented in *Abela*, the Sixth Circuit concluded that Abela was in custody at the time he invoked his *Miranda* rights and that he had made an unambiguous request for counsel; therefore, the statements subsequently obtained from Abela were unconstitutionally obtained and should have been suppressed.

However, *Abela* is of no assistance to Malcolm because *Abela* is factually distinguishable for the following reasons:

1. Following the stabbing incident, Abela was taken to a hospital emergency room for treatment, and after being treated for the injuries he had sustained in the two fights preceding the stabbing incident, he was then taken to the police station. Thus, Abela was "in custody" at the time he made the request for counsel. As explained above, Malcolm was not "in custody" at the time he made the statement concerning counsel; therefore, Malcolm could not effectively invoke his *Miranda* rights because he was not "in custody" at that time.

2. Abela made an *unambiguous* request for counsel that was not honored by the police officer. As explained above, even if it is assumed that Malcolm was "in custody," at the time he made the statement concerning counsel, his statement was not an unambiguous request for counsel.

Thus, *Abela* is not the panacea for Malcolm that he envisions it to be.

Consequently, since Malcolm was not "in custody" when he made the subject statement concerning counsel and since this statement was not an unambiguous request for counsel, his claim that the officers violated his constitutional rights by not honoring this request for counsel is without merit.

C.  **Waiver of *Miranda* rights**

Malcolm also argues that even though he was *Mirandized* and placed under arrest during the interview (approximately twenty-five (25) minutes after his statement concerning counsel that was made while he was not "in custody"), since he had previously communicated a desire to speak with an attorney before he had been *Mirandized* and before he had made any incriminating statements, the agents unlawfully continued to question him after advising him of his *Miranda* rights, as he had never waived his right to an attorney.

As noted and clearly explained in *Burket*, as set out above verbatim from the *Burket* opinion, since Malcolm was not "in custody" at the time he made the statement concerning counsel, it was insufficient to invoke his right to counsel. ("Under such circumstances, Burket could not invoke the protections provided by *Miranda*."). *Burket*, 208 F.3d at 197. In other words, during the time Malcolm was not "in custody" he had no standing to make a request for counsel. Thus, his statement was legally ineffective to invoke his *Miranda* rights at that time.

After Malcolm was placed under arrest and *Mirandized*, Malcolm acknowledged that he understood his *Miranda* rights; however, Malcolm did not elect to terminate the interview and continued to make incriminating statements. A similar situation was presented in *Burket*, wherein the Sixth Circuit concluded that Burket had impliedly waived his *Miranda* rights. The Sixth Circuit's rationale underlying this conclusion is set out below:

> Burket also contends that his *Miranda* rights were violated when the officers continued to converse with him after he had been advised of his *Miranda* rights. On direct appeal, the Virginia Supreme Court rejected this claim, holding that Burket waived his *Miranda* rights when he indicated that he understood his *Miranda* rights and was willing to talk to the police. *See Burket v. Commonwealth*, 450 S.E.2d at 131.
>
> To effectuate a waiver of one's *Miranda* rights, a suspect need not utter any particular words. *See United States v. Frankson*, 83 F.3d 79, 82 (4th Cir.1996). The Supreme Court has explained that "[t]he question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). "Thus, a defendant's subsequent willingness to answer questions after acknowledging his *Miranda* rights is sufficient to constitute an implied waiver." *Frankson*, 83 F.3d at 82 (citation and internal quotation marks omitted).

17

>In this case, Burket impliedly waived his *Miranda* rights. After Burket had been placed under arrest and advised of his *Miranda* rights, Detective Hoffman returned to the interview room to get Burket to fill out a booking form. At that point, Burket initiated a conversation with Detective Hoffman, and, once again, Burket was advised of his *Miranda* rights. Burket stated that he understood his rights and wanted to talk to Detective Hoffman. Even though Burket never said "I waive my *Miranda* rights" or filled out a waiver of rights form, his cooperation and desire to speak with Detective Hoffman, coupled with his acknowledgment that he understood his *Miranda* rights, constituted an implied waiver of his *Miranda* rights. *See Frankson*, 83 F.3d at 82. Accordingly, the Virginia Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

*Burket*, 208 F.3d at 198.

Based on the similarities between *Burket* and the present action concerning the "waiver" issue, the Magistrate Judge concludes that the *Burket* court's analysis of the "waiver" issue in that case is equally applicable to the present action and that Malcolm, like Burket, also impliedly waived his Miranda rights by acknowledging that he understood his *Miranda* rights and by continuing to make statements to the police officers after being *Mirandized*.

Therefore, the Magistrate Judge also concludes that Malcolm's claim that he was unlawfully interrogated after being *Mirandized* and that he had never waived his *Miranda* rights is without merit because (1) Malcolm's statement concerning counsel made while he was not in custody was legally ineffective to invoke his *Miranda* rights at that time, and (2) once Malcolm became "in custody" and was *Mirandized*, he acknowledged that he understood his *Miranda* rights and continued with the interview.

Accordingly, **IT IS HEREBY RECOMMENDED** that the defendant's motion to suppress certain statements made to ATF Agent Robert Young and Frankfort Police Detective Alan Burton while being interviewed by them at the ATF office in Lexington, Kentucky, on April 4, 2007 [DE #21] be **DENIED**.

The Clerk of the Court shall forward a copy of this Proposed Findings of Fact and Recommendation to the respective parties. Any objections to this Proposed Findings of Fact and Recommendation shall be filed within ten (10) days of the date hereof and any response to objections

filed shall be filed within five (5) days thereafter. In the absence of any objections filed hereto, a party waives the right to raise the objections in the Court of Appeals. 28 U.S.C. section 636(b)(1)(B); Thomas v. Arn, 728 F.2d 813 (6th Cir. 1984), affirmed, 474 U.S. 140 (1985); Wright v. Holbrook, 794 F.2d 1152, 1154-55 (6th Cir. 1986); Fed.R.Civ.P. 72(b).

This 2ND day of July, 2007.

JAMES B. TODD,
UNITED STATES MAGISTRATE JUDGE